# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**COMMODITY FUTURES TRADING COMMISSION,**

        **Plaintiff,**

**v.**                                          **Case No:   6:18-cv-1607-Orl-31GJK**

**RONALD MONTANO and MONTANO ENTERPRISES, LLC,**

        **Defendants.**

## ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 90) filed by Commodity Futures Trading Commission (the "**CFTC**"); the Motion for Summary Judgment (Doc. 92) filed by Ronald Montano ("**Montano**"); the Report and Recommendation (Doc. 114) issued by Magistrate Judge David A. Baker; the Objection to the Report (Doc. 115) filed by Montano; and the Response to the Objection (Doc. 116) filed by the CFTC.

Upon *de novo* review of the above, the Report will be adopted.

**I.     Background**

This case arises from the defendants' purported fraudulent scheme to induce consumers to open and fund illegal, off-exchange binary options trading accounts through unregistered brokers.

    **A.     Binary Options and Affiliate Marketing**

Binary options are financial instruments that allow customers to speculate whether the price of an asset will go above or below a certain point on a future date. (Doc. 90-3 at 64:22-65:7). With binary options, customers can speculate on multiple asset classes such as foreign exchange currency pairings (forex) and stocks. (*Id.*). If the customer's price prediction of an asset is correct, the

customer is entitled to a pre-determined amount of money. (*Id.*) If the price prediction is wrong, however, the customer loses their entire investment. (*Id.*)

Affiliate marketing is a type of performance-based marketing conducted through solicitation emails and promotional materials placed on Internet websites. (Doc. 72-12, ¶ 4). Affiliate marketing in binary options is often referred to as a "campaign or funnel" because the advertising is designed to direct customers "to a specific broker for the purpose of opening and funding a binary options trading account." (Doc. 72-12, ¶ 5; Doc. 72-10, ¶ 11). A campaign "generally involves the creation and bulk dissemination of solicitation materials." (Doc. 72-10, ¶ 12). Each time a customer receives a solicitation email and clicks an embedded link, the customer is redirected to the corresponding campaign website. The goal is to drive customers through the campaign website to a web page where they can open and fund a binary options trading account with a recommended broker. (*Id*. ¶ 13).

Affiliate marketers in binary options act as either affiliates or sub-affiliates. Affiliates generally come up with a marketing angle and create the marketing materials. (*See, e.g.*, *id.* ¶¶ 15–18). Sometimes affiliates use materials created by individuals they partner with for campaigns. (*See, e.g.*, *id.* ¶¶ 15–18). They may also recruit sub-affiliates who send out the marketing materials to their customer lead lists. (*See, e.g.*, *id.* ¶¶ 20–21; Doc. 72-6, ¶¶ 17–22).

Each time a customer opens an account and deposits the minimum amount required by the broker, they are deemed a "first time buyer" and the affiliate who launched the campaign, and the sub-affiliates who assisted with the campaign, receive a commission. (*See, e.g.*, Doc. 72-10, ¶¶ 26–27; Doc. 72-6, ¶ 23).

### B.    Montano's Binary Options Affiliate Marketing[1]

In November 2001, Montano formed Montano Enterprises, LLC ("**MEL**") and served as its

---

[1] The following facts are taken from the "Statement of Undisputed Facts" in the CFTC's

only managing member and employee. (Doc. 90, ¶¶ 3–4). In that role, Montano managed all of MEL's operations and possessed sole signatory authority over MEL's bank accounts. (*Id.* ¶ 4). Montano and MEL never registered with the CFTC in any capacity. (Doc. 72-7, ¶¶ 8, 10).

Between September 2013 and December 2016, Montano, acting individually and on behalf of MEL, solicited prospective customers to open and fund binary options trading accounts. (Doc. 90, ¶¶ 10). To do this, Montano participated in thirty-five affiliate campaigns that offered free access to an automated trading system ("**Trading System(s)**") to prospective customers who opened and funded a binary options trading account through a recommended broker. (*Id.*). Of the thirty-four campaigns that Montano participated in, he launched and acted as an affiliate for twenty-one: (1) Binary Cash Code; (2) Free Cash App; (3) Free Profits; (4) Trader App; (5) Automobile Code; (6) Binary Brain; (7) Stock Matrix Pro; (8) Money Platform; (9) Larry's Cash Machine[2]; (10) Live Profits; (11) Copy Trade Profit; (12) Binary Hijack; (13) 3 Week Millionaire; (14) Stock Matrix Pro(2); (15) Azure Method; (16) Centument; (17) Trianasoft; (18) Binary Interceptor; (19) Binary Interceptor(2); (20) Mobile Binary Code; and (21) Centument Redux/2.0. (*Id.* ¶ 11).

To host his campaigns, Montano and/or his partners purchased and created the campaign websites or used websites provided by broker intermediaries BOA Elite ("**BOA**") or Boost Affiliates ("**Boost**"). (*Id.* ¶ 16). Montano created and/or procured, reviewed, and disseminated bulk solicitation emails to prospective customers regarding the binary options Trading Systems. (*Id.* ¶¶ 15, 17–18; Doc. 98, p. 7). The solicitation emails contained embedded links to corresponding campaign

---

motion, (Doc. 90, ¶¶ 1–81), and the "Disputed Material Facts" in Montano's motion, (Doc. 98, pp. 6–8).

[2] Montano claims that he didn't launch Larry's Cash Machine. (Doc. 98-1 at 224:5-14, 295:23-296:2; Doc. 98-4, ¶¶ 8, 11).

websites that automatically streamed videos on the landing pages. (Doc. 90, ¶ 15). From there, customers were redirected to BOA or Boost to open a binary trading account with a recommended broker that BOA or Boost selected. (*Id.* ¶ 16).

Montano also acted as a sub-affiliate for fourteen of the thirty-five campaigns: (1) Binary Matrix Pro; (2) A.I. App; (3) Home Online Earners; (4) Cash Code; (5) Peak Profits; (6) 10k in 7 Days; (7) Overnight Profits; (8) Auto Profit Signals; (9) Coffee Cash Cheat Sheet; (10) Medallion(aire) App; (11) Binary Bank Breaker; (12) Stark Trading System; (13) Cloud Trader; and (14) Trade Tracker Pro. (*Id.* ¶¶ 14, 19). Solicitation materials for the campaigns Montano launched as an affiliate or participated in as a sub-affiliate all offered free access to Trading Systems for binary options on commodities once the customer opened and funded an account with the broker they were funneled to. (Doc. 90, ¶¶ 10, 20). The solicitation materials also guaranteed or advertised that the Trading Systems would generate profits with no risk of loss. (*Id.* ¶¶ 10, 20, 33, 42–51).

Included in the solicitations were fake historical profits and/or live trading results and other misrepresentations to assure the viewer that the information relayed was real, but it wasn't. (*Id.* ¶ 27, 30). For example, Montano's email solicitations falsely claimed that users can and have already "made millions" and achieved "mind-blowing results" trading with the Trading System. (*Id.* ¶ 28).

Email and video solicitations that Montano used (or made available to others) included fake testimonials of purported users of the advertised Trading System and "proof" of results via fictitious bank or trading account screenshots. (*Id.* ¶¶ 30, 32). Montano even provided an image of his bank account to falsely portray as a successful binary options trader although he never traded binary options. (*Id.*).

Other common statements in Montano's solicitations created false urgency to convince prospective customers to invest immediately to avoid missing out. (*Id.* ¶ 34). For example, the email

and video solicitations Montano disseminated or made available to others stressed the limited availability of the Trading System, and/or some restriction on the amount of time left to take advantage of the opportunity, although no limits existed. (*Id.* ¶ 34).

As a result of Montano's campaign solicitations, at least 10,000 customers opened and funded binary options trading accounts. (*Id.* ¶ 61). Brokers or their intermediaries—Boost and BOA—paid Montano (or Montano's partner(s)) between $250-$400 for each customer that opened and funded an account with them due to solicitations that he, his partner(s), or others acting as sub-affiliates disseminated on his behalf. (*Id.* ¶ 62). Thus, Montano campaigns generated between at least $2,500,000-$4,000,000 in commissions. (*Id.* ¶ 63). Montano also earned commissions and prizes as a sub-affiliate for campaigns that others launched, including at least $48,000 and a Rolex watch valued at approximately $25,000. (*Id.* ¶ 64).

On September 27, 2018, the CFTC brought a civil enforcement action against Montano and MEL, alleging violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (the "**CEA**" or the "**Act**") and the accompanying regulations, 17 C.F.R. §§ 1.1 et seq. ("**Regulations**"). (Doc.1). The Complaint asserts claims for:

(1)  options fraud in violation of CEA § 4c(b), as amended 7 U.S.C. § 32.4 6c(b), and Regulation § 32.4, 17 C.F.R. § 32.4 (Count I);

(2)  commodity trading advisor fraud in violation of CEA § 4*o*(1), as amended 7 U.S.C. 6*o*(1), and Regulation § 4.41(a) (Count II);

(3)  fraudulent advertising in violation of Regulation § 4.41(a)(1)-(3), (b)(1)-(2), and 17 C.F.R. § 4.41(a)(1)-(3), (b)(1)-(2) (Count III); and

>   (4)    unlawful use of a manipulative and deceptive device, scheme, or artifice in violation of CEA § 6(c)(1), as amended 7 U.S.C. 9(1), and Regulation § 180.1, 17 C.F.R. 180.1(a)(1)-(3) (Count IV).

(*Id.* ¶¶ 114–156).

On September 27, 2018, the CFTC served Montano and MEL with the summons and Complaint. (Doc. 7).[3] On November 29, 2018, Montano filed an Amended Answer and Affirmative Defenses. (Doc. 37). A year later, the parties filed competing motions for summary judgment, which the Court referred to United States Magistrate Judge David A. Baker.

Upon review, and after briefing by the parties (*see* Docs. 90, 92, 97, 98, 99, 100), Judge Baker issued a Report and Recommendation ("**Report**"). (Doc. 114). In the Report, Judge Baker agreed with the CFTC's argument that Montano's affirmative defenses lacked merit and that Montano and MEL were derivatively liable for each other's actions. (*Id.* at 20–22, 23). Therefore, he recommends that the Court grant the CFTC's motion to that extent. (*Id.* at 24). However, due to the complexities of this case and the fact that all inferences must be drawn in the light most favorable to Montano, Judge Baker recommends that the Court deny the CFTC's motion in all other respects. (*Id.* at 19–20, 24).[4]

Judge Baker also recommends that the Court deny Montano's motion due to his failure to

---

[3] MEL didn't answer or otherwise respond to the Complaint. So, on November 19, 2019, the CFTC moved for entry of a clerk's default against MEL. (Doc. 31). The Clerk entered the default on December 10, 2018. (Doc. 39). Subsequently, the CFTC moved for entry of a default judgment against MEL, (Doc. 72), and MEL moved to set aside the Clerk's default, (Doc. 74). On July 15, 2019, the Court denied both motions. (Doc. 79).

[4] The CFTC did not object to Judge Baker's recommendation for the denial of its motion for summary judgment.

establish his entitlement to summary judgment. (Doc. 114, pp. 9–19). As discussed in greater detail below, Montano filed an Objection to the Report. (Doc. 115). The CFTC has responded in opposition to the Objection. (Doc. 116). Therefore, this matter is ripe for adjudication.

## II.   Legal Standards

### A.   Review of Report and Recommendations

In resolving objections to the recommendation of a magistrate judge, the district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.[5] Fed. R. Civ. P. 72(b)(3). *De novo* review requires independent consideration of factual issues based on the record. *Jeffrey S. by Ernest S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 513 (11th Cir. 1990). After conducting a careful and complete review of the findings and recommendations, the district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

### B.   Motions for Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party

---

[5] Where a litigant does not make specific objections to a magistrate judge's factual findings, those findings are reviewed for clear error. *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993).

opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

**III.   Analysis**

Montano raises nine objections to Judge Baker's Report. The Court takes each in turn.

**A.        Shotgun Pleading**

Montano first argues that Judge Baker erred in concluding that the CFTC's Complaint does not constitute an impermissible shotgun pleading. (Doc. 115, pp. 3–4). As support, Montano cites *Tran v. City of Holmes Beach*, 19-13470, 2020 WL 4036588, at *2 (11th Cir. July 17, 2020). The Court is unpersuaded.

"The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds

upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). No such impossibility exists here. As the Court stated over a year ago (*see* Doc. 80, pp. 3–4), the Complaint provides sufficient notice of the claims brought against Montano and the grounds upon which each claim rests. *Tran* offers no basis for the Court to depart from its prior ruling. So the Court rejects Montano's first objection.

### B. CFTC Jurisdiction

For his second objection, Montano insists that Judge Baker incorrectly found that there is sufficient evidence to create a "reasonable inference that Montano provided access to [T]rading [S]ystems in connection with commodities trading governed by the Act," and therefore, the CFTC could exercise jurisdiction over this matter. (Doc. 115, pp. 4–6; Doc 114, p. 10–11).

However, the Act grants CFTC exclusive jurisdiction over "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2. The term "commodity" includes agricultural commodities (such as wheat, cotton and rice) and "all other goods and articles, except onions, and all services, rights and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

Here, the CFTC proffers ample evidence showing Montano's campaigns marketed Trading Systems that purported to automatically trade binary options on commodities as defined under the Act. (Doc. 90, ¶ 10; Doc. 72-7, ¶¶ 38, 45–50). Indeed, many of the solicitation materials that Montano directly and indirectly disseminated to prospective consumers identified metals, oil, and currencies as available for trade or as having been profitably traded. (*See, e.g.*, Doc. 90-4, pp. 18–74); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 37 (D.D.C. 2015) (explaining that gold and currencies are commodity options under the Act).

Thus, the CFTC has jurisdiction over this matter and Montano's second objection fails.

*CFTC v. Atkinson*, No. 18-23992-CIV, 2019 WL 2125026, at *1 (S.D. Fla. Feb. 4, 2019) (rejecting the defendants' argument that the binary options at issue were not regulated assets within the CFTC's jurisdiction where, like here, the defendants offered free access to their automated trading system upon the filing of a new binary options trading account with a recommended broker).

### C. Fifth Amendment

For his third objection, Montano claims that Judge Baker erred in rejecting his vagueness challenge under the due process clause of the Fifth Amendment. (Doc. 115, pp. 6–7). Montano is wrong. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rock*ford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). However, the due process clause does not demand "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Rather, a statute is only unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (citation omitted).

There are two types of challenges under the void-for-vagueness doctrine—a facial challenge and an as-applied challenge. A facial challenge "seeks to invalidate a statute or regulation itself."[6] *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir.2013) (citation omitted). By contrast, an as-applied challenge "addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party. *Harris v. Mexican Specialty Foods, Inc*., 564 F.3d 1301, 1308

---

[6] A party can only make a facial challenge to a statute if "no standard of conduct is specified at all," *Parker v. Levy*, 417 U.S. 733, 755–757, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974), and if the statute "is impermissibly vague in all its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982).

(11th Cir. 2009).

Here, Montano argues that the laws underlying the CFTC's claims are unconstitutionally vague "as applied to him." (Doc. 92, pp. 4, 5, 8). But he submits no case law to support his bald assertions. Nor does he make any convincing argument that the laws impermissibly left him with doubt as to whether his activities were prohibited or that the laws invite arbitrary or discriminatory enforcement. (*See generally*, Docs. 92, 115). Indeed, Montano makes no attempt to even analyze the underlying laws to demonstrate how they are vague as applied to his conduct.

Instead, Montano essentially attacks the CFTC's ability to prove its case. He argues that the CFTC has failed to establish that he offered to enter into any commodity option transaction or that he acted as a commodity trading advisor ("**CTA**") as defined under the Act. Montano also claims that he is merely a professional affiliate marketer who made commissions based on deposits that consumers made to binary trading accounts. (Doc. 92, pp. 4–8, 13–14, 18–19; Doc. 115, pp. 6–7).

However, these arguments do not amount to a constitutional challenge. Moreover, contrary to Montano's assertions otherwise, there is evidence showing that he made false and misleading representations in connection with offers to enter into commodity option transactions, *see* Part III.G., and that he acted as a CTA rather than a mere marketer, *see* Parts III.E., III.F. Accordingly, Montano has failed to establish that the laws underlying the CFTC's claims are unconstitutionally vague as applied to him.

### D.     Expert Witness

Next, Montano contends that Judge Baker erred by rejecting his argument that he is entitled to summary judgment because the CFTC failed to produce expert testimony showing that binary options existed or that the Trading Systems would have allowed access to them. But, as Judge Baker correctly noted, no expert testimony is necessary regarding these issues because solicitation fraud

does not require proof of "a consummated options trade or the possession by the offeror of an option for sale or purchase." *CFTC v. White Pine Trust Corp.*, 574 F.3d 1219, 1225 (9th Cir. 2009); *CFTC v. Brockbank*, No. 2:00-cv-622 TS, 2006 WL 223835 *3 (D. Utah 2006); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106-1107 (C.D. Cal. 2003).

### E. Mere Marketer

Montano posits that Judge Baker should have recommended summary judgment on Count I[7] because he merely served as a "marketer" of Trading Systems and there is no evidence that those systems traded automatically or that they dealt with commodity interests. (Doc. 114, p. 9). As support, Montano relies on *CFTC v. Mass Media Mktg*, 297 F. 3d 1321 (11th Cir. 2002) and *White Pine Trust*, 574 F. 3d 1219.

As an initial matter, whether the Trading Systems performed as promised in Montano's solicitations and marketing material is irrelevant to the CFTC's ability to prove its claims. *See, CFTC v. Brockbank*, No. 2:00–CV–622 TS, 2006 WL 223835 *3 (D. Utah 2006) ("The Court finds that it is not necessary to allege that there were actual trades . . . for the CFTC to state a valid claim"); *CFTC v. Weinberg*, 287 F.Supp.2d 1100, 1106-1107 (C.D. Cal. 2003) (the CFTC recovered restitution and civil penalties commodities, but never actually made such trades); *CFTC v. R&W Tech. Servs.*, 205 F.3d 165, 172-74 (5th Cir. 2000) (finding commodity option fraud for misrepresentations regarding the risks of trading when selling trading software to customers even though parties did not execute any trades for customers).

Furthermore, as the Court explained in its prior order, *Mass Media* is factually

---

[7] In Count I, the CFTC asserts a claim for options fraud pursuant to Section 4c(b) of the Act, 7 U.S.C.§ 6c(b) (2012), together with Regulation 32.4, 17 C.F.R. § 32.4 (2019), which prohibit fraud "in or in connection with" an offer to enter into or confirm the execution of any transaction involving any commodity regulated under the Act.

distinguishable from this case. (Doc. 80, pp. 4–5). In *Mass Media*, the CFTC asserted a claim for options fraud against defendants who "produced general commercials designed to solicit members of the general public to invest in commodity options." *CFTC v. Mass Media Mktg., Inc*., 297 F.3d 1321 (11th Cir. 2002). But the district court concluded, and the Eleventh Circuit affirmed, that the defendants' activities did not fall within the boundaries of the Act or the jurisdiction of the CFTC because the defendants' commercials "never involved the making of an offer to enter into a commodity transaction or assisting customers in carrying out such transactions." *Id.* at 1326. Instead, they simply instructed viewers to call an 800–number to obtain information about commodity options. *Id.* at 1323. Viewers who responded to the commercial advertisements reached an independent answering service that collected the callers' information and then sold the information to a broker. *Id.*[8]

The broker paid the defendants based on the number of names, or leads, generated by the commercial. *Id.* The defendants never collected any money from callers nor were they paid on the number of callers who subsequently opened accounts through the introducing broker or on the number of trades placed by the callers who became customers. *Id.* Also, the defendants never discussed commodity investments with the callers. *Id.* Those discussions took place once an introducing broker purchased the leads from the defendants and then contacted the caller itself. *Id.*

In contrast, here the evidence shows that Montano solicited potential customers through emails, websites, and videos and advised them as to the value of trading in binary options using the advertised Trading Systems that purported to automatically trade in commodities on their behalf.

---

[8] The defendants also called individuals who had once responded to an advertisement and, if the prospective customer stated that he or she was interested in speaking to a broker, the defendants would sell the lead to any interested broker. *CFTC v. Mass Media Mktg., Inc*., 297 F.3d 1326 (11th Cir. 2002).

- 13 -

(Doc. 90, ¶¶ 10, 24, 27-28, 33, 40, 43, 46-47; Doc. 98-1 at 105:1-14 (Montano admitting that he sent out emails with links to websites that contained videos "talking about binary options and . . . making money in binary options"). Moreover, unlike the *Mass Media* defendants, Montano earned commission only when a customer opened and funded an account to trade binary options as a result of his (or his agents') solicitations. *Id*. So *Mass Media* lends no support to Montano's position.

Neither does *White Pine*. In that non-controlling case, the Ninth Circuit concluded that the CFTC did not have power to bring its action for options fraud because the defendant solicited money from the public to invest in a "discretionary commodities trading account" but he did "not offer to place orders on options or any other financial instrument." *White Pine Trust*, 574 F. 3d 1221, 1226.

Montano, by contrast, did not offer to manage any accounts on a discretionary basis; rather, he offered access to Trading Systems that prospective customers could purportedly use to directly enter binary options transactions automatically. Therefore, as Judge Baker correctly observed, Montano's conduct is markedly different from the defendant's activities in *White Pine*.

### F.     Commodity Trading Advisor

For his sixth objection, Montano argues that Judge Baker erred in rejecting his claim that he is not a CTA. (Doc. 115, pp. 9–10). False. Under the Act, a CTA includes anyone who, "for compensation or profit, engages in the business of advising others, directly or through publications, writings, or electronic media, as to the value of or advisability of trading in" commodity futures, options or swaps. 7 U.S.C. § 1(a)(12)(A)(i). The Act further specifies that a CTA also includes anyone who, for compensation or profit, as part of a regular business, issues or promulgates analyses or reports of any contract of sale of commodity futures, options, or swaps. *Id*. at § 1(a)(12)(A)(ii)).[9]

---

[9] 7 U.S.C. § 1a(12)(B)(iv) (2012) excludes from the definition of a CTA any publishers or producers of print or electronic data of general and regular dissemination. However, courts have consistently held that vendors of trading systems, like Montano, do not fall within the scope of this

Montano created and disseminated campaign solicitations that advised prospective customers to trade in binary options using marketed Trading Systems that supposedly automatically traded once a customer opened and funded an account with a recommended broker. (Doc 90, ¶¶ 10, 20; Doc. 90-4, pp. 18–74; Doc. 98-1 at 105:1-14). Montano earned a commission each time a customer took his advice and opened and funded a binary options trading account with a broker to gain access to the offered automatic Trading System. (Doc. 90, ¶ 62). This evidence suffices to show that Montano acted as a CTA by advising customers of the value or advisability of trading in binary options commodities for compensation or profit. Thus, Montano's argument fails.

### G.     Binary Options Trade Transactions

As Montano's seventh objection, he argues that "the CFTC has failed to produce any evidence of binary options relating to commodities that are tied to Montano." (Doc. 115, p. 10). However, as noted *supra*, there is ample evidence showing that Montano's campaigns marketed Trading Systems that purported to automatically trade binary options on commodities as defined under the Act. *See* Part III.B. Furthermore, solicitation fraud does not require proof of an executed options trade or the possession by the offeror of an option for sale or purchase. *See* Part III.D. So this objection fails.

### H.     Territoriality

Next, Montano submits that none of the provisions cited in the CFTC Complaint against

---

exemption. *See, e.g., R&W Tech. Servs. v. CFTC*, 205 F.3d 165, 174-76 (5th Cir. 2000); *Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 689 (7th Cir. 1998) (finding that an entity that produced publications that "include[d] securities and commodity market charts, market commentary, and educational publications concerning markets and trading" was a CTA); *CFTC v. Maggio*, No. C05-5766RJB, 2007 WL 2900180, at *1, *3 (W.D. Wash. Oct. 1, 2007) (denying summary judgment and finding that "even if [d]efendants can be considered impersonal publishers, [d]efendants have not shown that their website advice and published information are incidental to their business. The website and publications are their business.").

Montano specifically provide for application to extraterritorial transactions, so the Court should provide partial summary judgment on the alleged trades and transactions that took place outside of the United States. (Doc. 115, p. 11 (citing Doc. 92, pp. 26–27). The Court declines.

If a statute has no extraterritorial application, the Court must examine the statute's "focus" to "determine whether the case involves a domestic application of the statute." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101, 195 L. Ed. 2d 476 (2016). To determine the statute's "focus," courts consider the "conduct" that the statute "seeks to regulate." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137, 201 L. Ed. 2d 584 (2018) (citation omitted). If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101.

As the CFTC correctly points out, even if the laws at issue do not apply extraterritorially, its claims against Montano constitute a satisfactory domestic application of the CEA because the "focus" of the laws seek to regulate the conduct that Montano is charged with committing within the United States.[10] Thus, his request for "partial summary judgment" on this issue is rejected.

### I.     Restitution and Disgorgement

As his final objection, Montano claims that Judge Baker should have recommended

---

[10] *See* 7 U.S.C. §§ 6c(b) (focusing on, *inter alia*, the offer of transactions in options), 6o (focusing on the use by, *inter alia*, a CTA of the mails or any means or instrumentality of interstate commerce to defraud any client or prospective client), § 9(1) (focusing on the use or attempted use of manipulative or deceptive devices in connection with, as relevant here, any swap) (2018); 17 C.F.R. §§ 4.41 (focusing on advertising by, *inter alia*, a CTA), § 32.4 (focusing on, *inter alia*, the offer of a commodity option transaction), § 180.1 (focusing on the use or employment, or attempted use or employment of any manipulative device, scheme, or artifice to defraud in connection with, as relevant here, any swap).

judgment in his favor on the issue of disgorgement and restitution. The Court disagrees. Under the Act, the equitable remedy of restitution "focuses on the defendant's unjust enrichment." *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008). Thus, "[t]he proper measurement [of restitution] is the amount that [Defendants] wrongfully gained." *Id.*; *CFTC v. Gutterman*, No. 12-21047-CIV, 2012 WL 2413082, at *9 (S.D. Fla. June 26, 2012) (calculating restitution by calculating the amount taken, less the amount returned, less the amount lost in trading).

Here, the CFTC has submitted evidence showing that Montano's solicitations successfully lured at least 10,000 consumers to open and fund a binary options account with a minimum of at least $250 (for a total of at least $2,500,000). There is no record evidence showing that those funds were ever actually traded or returned to the consumers. Accordingly, there is sufficient evidence to support the CFTC's request for restitution.

Regarding disgorgement, the CFTC must show a "reasonable approximation" of the defendants' ill-gotten gains. *CFTC v. Amerman*, 645 F. App'x 938, 943-44 (11th Cir. 2016). After that, the burden shifts to the defendants to show that the number is not reasonable. *Id*. Here, the CFTC has supplied evidence showing that Montano received $6,509,953.84 in commissions, proceeds, and prizes for campaigns he launched or supported as sub-affiliates. (Doc. 90, ¶¶ 56–64). Montano does not challenge any of that evidence. Therefore, there is also sufficient evidence to support the CFTC's request for disgorgement.

Having disposed of Montano's Objection, the Court reviews the remaining portions of the Report for clear error. *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993). Finding none, the Court concludes that the remainder of the Report is due to be adopted.

**IV.	Conclusion**

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. Judge Baker's Report and Recommendation (Doc. 114) is **CONFRIMED** and **ADOPTED**, as set forth above.

2. Montano's Objection to the Report and Recommendation (Doc. 115) is **OVERRULED**.

3. The CFTC's Motion for Summary Judgment (Doc. 90) is **GRANTED IN PART.** The CFTC's motion is **GRANTED** to the extent that it seeks judgment as to Montano's affirmative defenses and as to Montano and MEL's joint liability.

4. In all other respects, the CFTC's motion is **DENIED**.

5. Montano's Motion for Summary Judgment (Doc. 92) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 29, 2020.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE